FRANK F. ROBY v. STATE, EX REL. FARMERS GRAIN & LIVE STOCK COMPANY ET AL.

FILED APRIL 18, 1906. No. 14,267.

1. **Railroads:** SIDE-TRACKS: HIGHWAYS. A side-track constructed and used by a railroad company, and which connects with its main line and occupies a portion of the public streets of a city under a grant from the city to such company, will be presumed, in the absence of evidence to the contrary, to be a part of the public highway system of such company, and a public highway within the meaning of section 4, art. XI of the constitution.

2. The term railroad includes all side-tracks necessary or convenient for the transaction of the company's business.

3. Evidence examined, and *held* sufficient to sustain the finding and order of the trial court.

ERROR to the district court for Buffalo county: BRUNO O. HOSTETLER, JUDGE. *Affirmed.*

*E. C. & H. V. Calkins,* for plaintiff in error.

*Warren Pratt, C. A. Robinson, Edson Rich* and *John N. Baldwin, contra.*

ALBERT, C.

The Farmers Grain and Live Stock Company applied to the district court for a writ of mandamus to compel the Union Pacific Railroad Company to furnish cars on a cer-

tain side-track for the shipment of grain from the relator's elevator. Frank F. Roby intervened for the purpose of resisting the application. The district court allowed the writ and the intervener brings error.

A somewhat extended statement of the facts is necessary to a proper understanding of the case. In 1886 the Kearney Milling Company built a flouring mill in the city of Kearney, and induced the respondent railroad company to construct a side-track, extending eastward from its connection with the main track to and across certain lots owned by the milling company, upon which its mill stood. In order to reach the mill property, the track was constructed for some distance on a public street, and across certain other streets and alleys of the city, and also across the corner of a lot belonging to a third party. This side-track extended east and west immediately north of the mill, and a warehouse and elevator were afterwards erected by the milling company immediately north of the side-track. Afterwards the milling company moved its elevator to two lots, belonging to it, lying east of the premises just mentioned, and just across one of the alleys of the city, and the side-track, in order to accommodate the elevator in its new location, was extended eastward across the alley and across a lot belonging to the milling company. In 1898 proceedings were brought to foreclose a mortgage covering the milling company's property, and the property passed into the hands of a receiver appointed in said proceedings. The receiver leased the elevator on the lots east of the mill to certain third parties, and such lessees leased certain lots belonging to other parties lying east and just across a public street from the elevator, and for the better accommodation of the elevator induced the respondent railroad company to extend the side-track across such street and one of the lots east of the elevator property. The mortgage was foreclosed, and the intervener became the purchaser thereof at foreclosure sale, obtaining possession thereunder in March, 1899. Early in the summer of 1901 he inclosed the mill property with a fence, placing gates

across the side-track, securing them by locks. At that time, however, service on the side-track was not required beyond the west line of the intervener's property, save for the accommodation of the intervener himself. In 1903 the relator bought the two lots lying across the street from the ·elevator, and across one of which the side-track had been extended, and erected thereon a grain elevator for the storage and shipment of grain. The relator's elevator was so placed that it could be easily accommodated by the side-track in question. When the relator got ready to ship grain from its elevator, the intervener refused to permit the respondent to move cars over the side-track across his premises, claiming that such track had been constructed solely for the accommodation of his grantors, and that the occupancy of his premises by the respondent, with its track, was merely by virtue of a license, and not by virtue of any easement in such premises for a right of way. The evidence is somewhat meager as to the arrangement between the milling company, the intervener's predecessor in estate, and the respondent railroad company for the construction of the side-track in the first place. One witness who was president of the milling company during the negotiations for the side-track and who took part therein, when examined as to such arrangement, testified as follows: "My recollection is they insisted we should give them the right of way, and there was a lot west of the mill. They sent a man out here at that time; there was some question as to whether the city would let us down through there, and they sent a man out to see whether they could get to the mill. He reported that he would have to go across that lot that was right across there west; and that he would have to cut off the corner of it, if he crossed, there would be a short curve, that the curve would be too sharp; and they insisted, in case there was any damage, that the milling company would have to pay the railroad company whatever damage there was to that lot. That is my recollection. Q. Was the milling company to get any damages or anything for the right of way across this prop-

erty? A. I don't think so; of course that is a long time ago."

Cross-examination: "Q. They wanted a switch to the mill so that they could load and unload? A. Yes. Q. They wasn't seeking to get it for any other purpose excepting the accommodation of the mill? A. That was all. Q. Any talk of it being used for anything else? A. So far as I can re-collect there was not. Q. There was no agreement that it was not to be used for any purpose but for your mill, was there? A. I have no recollection of anything being said.": It also appears that, when the milling company moved its elevator to the lots east of the mill, the respondent agreed to extend the track and pay for moving the elevator. In each instance it laid the track and furnished the material. Before the side-track was constructed the city granted the respondent a right of way over and across such of the streets and alleys as it traversed or crossed.

These facts, we think, warrant an inference that the respondent constructed the side-track across the intervener's premises under at least an implied grant of a right of way from the intervener's privies in estate, the then owners of the premises, and that such track now constitutes a part and parcel of the respondent's railroad system, open alike to all requiring service thereon. Section 4, art. XI of the constitution is as follows: "Railways heretofore constructed, or that may hereafter be constructed in this state are hereby declared public highways, and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law." The term railroad includes all side-tracks necessary or convenient for the transaction of the company's business. *Township of Rock Creek v. Strong*, 96 U. S. 271; *Black v. Philadelphia & R. R. Co.*, 58 Pa: St. 249; *Town of Mason v. Ohio River R. Co.*, 51 W. Va. 183; *State v. Stone*, 119 Mo. 668. The side-track in question is connected with the respondent's main line. In the absence of evidence to the contrary, taking into account the fact that it crosses the property of third parties and occupies a portion of the

public streets of the city under a grant from the city, the presumption would be that it is a part of the respondent's railroad system, and a public highway within the meaning of the constitutional provision above quoted. That presumption is not rebutted by the evidence in this case, but rather strengthened. The evidence shows that before constructing the road the respondent, in its negotiations with the milling company, the intervener's predecessor in estate, insisted on a right of way. It is true, it was built at the instance of the milling company and for years was used almost, if not quite, exclusively for its benefit, but that appears to have been because there were no other persons who could be acommodated thereby. It is also true that the intervener, after the track had been laid almost 15 years, put gates across it and inclosed his premises with a fence, but at the time there were no persons beyond his premises who required service on the side-track and the gates therefore were no restriction on general traffic.

It seems to us that the finding of the district court is fully sustained by the evidence, and that the writ was properly allowed. It is recommended that the order allowing the writ be affirmed.

JACKSON, C., concurs.

By the Court: For the reasons stated in the foregoing opinion, the order of the district court allowing the writ is

AFFIRMED.