NORTHERN GRAVEL COMPANY, Appellant, v. MUSCATINE NORTH
& SOUTH RAILWAY COMPANY, FRANK E.
HOOPES, Intervener, Appellees.

CARRIERS:   Facilities Furnished—Discriminations—Allowing Use of
Spur Track by Shipper.   Where a railway company has con-
structed a spur track for the convenience of shippers, it can-
not grant to a particular shipper, as against other shippers, the
exclusive right to use such track, as the same would be in viola-
tion of Section 2125, Code Supp., 1913, forbidding discrimina-
tions; and such a contract, when made, is void.

PARTIES:   Intervention—Right to Intervene.   An owner of land
along a spur track, who has sold part of the same, with an agree-
ment to defend his grantees in the use of switch tracks, has such
an interest as to be allowed to intervene in a suit brought by
another shipper, seeking to restrain the railway company from
allowing the use of the track by other shippers.

*Appeal from Muscatine District Court.*—A. P. BARKER,
Judge.

APRIL 15, 1919.

THE opinion sufficiently states the case.—*Affirmed.*

*J. G. Kammerer* and *E. F. Richman,* for appellant.

*Jayne & Hoffman* and *J. F. Devitt,* for appellees.

WEAVER, J.—The defendant company owns and oper-
ates a line of railroad in Muscatine County in this state.
At the place under consideration, the company's right of
way and track extend from the southwest to the northeast,
as indicated by the line A B C on the following plat.

The land lying along and to the east of the railway has,
for many years, been very largely devoted to the raising of
melons and other garden products.   In the year 1899, the
owners of these lands, or some of them, desiring more con-
venient shipping facilities, entered into an arrangement with
the railroad company by which, in consideration of the con-
struction and maintenance of a switch or spur track from

its main line at B southward to a point at or near E, they, the landowners, undertook to and did furnish and grade the right of way therefor.  The track was laid by the company,

and since that time has been quite largely used, especially in the summer season, for loading and shipping out the produce of the neighborhood, as well as for the delivery of other freight from outside sources to that portion of the public.  This switch line between the points mentioned is generally spoken of in the record as the "Hahn Switch." As originally constructed, it extended from B straight south, a little more than a half mile, to H, where it curved a short distance east to or near the highway F E G, known as the "Stewart Road."  About the year 1911, the railway company extended the track from the Hahn switch at H directly south to D, and used the entire line from B to D

for the handling of large quantities of sand and gravel for the ballasting of its main track and other purposes. In the year 1914, one Boynton, being the owner of a sand pit on the tract marked X Y F D, entered into a written contract with the railroad company, by which he undertook to construct and make ready machinery and other facilities of a prescribed capacity for operating the sand pit and loading its product on cars to be furnished by the company. In consideration of the covenants on Boynton's part, the company agreed "to maintain and operate the said side track from its main line to the pit, with necessary turnouts, switches, and connections." It was by the contract further provided that:

"These tracks shall be for the exclusive use of the second party (Boynton) or his assigns, except that, in the event the first party (railroad company) can locate an industry or industries on or along the same between the main line connection and the present switch to the icehouses, the second party shall make no objection thereto, always provided that such industry shall not be a competitor of the first party, and that the business thereto and therefrom shall be handled so as not to interfere with the business to or from the gravel pit. * * * The lessor shall have the privilege of loading any farm produce on the line from the icehouses to the gravel pit."

The icehouses referred to were, as we understand the record, at the southern terminus of the Hahn switch, at E. There was also built at the same point a warehouse for the storage of goods. In consideration of these and other privileges, which we will not extend this opinion to mention at large, Boynton undertook to pay to the railroad company, "as rental for the use of the said side tracks, switches, and connections at the pit, the sum of $1,080 yearly," also certain switching and transportation charges, and to furnish for such transportation a certain minimum of carloads of

the product of his pit. The contract provided for its con-
tinuance for a term of six years.

Returning now to the matter of the Hahn switch and its
original construction, it appears that its terminus at or
near the Stewart road was upon the land of one Hoopes.
As did other landowners, Hoopes conveyed the right of way
to the company. The deed therefor provided that such right
of way was to be used for a switch or side track for the pur-
pose of receiving, transporting, and unloading freight, and
that the title so conveyed should revert to the grantor,
should the switch thereafter be abandoned. This switch
from the main line to the Stewart road has, at all times since
its construction, been maintained and used as a side track
or convenience for the shipment of the products of the lands
of that neighborhood, and for the delivery to the landown-
ers of fertilizers, feed, and other supplies. In the more re-
cent years of that period, the volume of business of that
character has diminished, but it has never been abandoned,
and the company has at all times continued such possession,
maintenance, and use of the track. Hoopes, the grantor
above mentioned, is now dead, and the intervener in this
action, as one of his heirs, has succeeded to the title to the
land. On this land is another sand and gravel pit, and from
time to time after the construction of the Hahn switch, and
beginning before the extension of the track to the Boynton
pit, sand and gravel had been shipped by Hoopes or by other
landowners of that neighborhood over the Hahn switch to
points on the main line. The Hoopes switch was not so sit-
uated as to permit of direct loading upon the cars, and the
product was hauled to the track by wagons. These ship-
ments were not very great, but were made in carload quan-
tities, and continued for such length of time as to afford
material bearing upon the question of the mutual under-
standing by the company and the public at that point con-
cerning the purpose and use for which the switch track was

provided.  In 1914, and after the making of the contract between the company and Boynton, the company, under an arrangement of some kind with Hoopes, extended the "spur" end of the Hahn switch across the Stewart road and further into the land owned by Hoopes.  The record at this point is neither clear nor definite, but we may assume that this extension was made to facilitate the shipment of sand and gravel from the Hoopes pit, and with the intent and purpose to haul such product over the said Hahn switch to the main line.  Hoopes thereafter sold or entered into contract to sell his pit to other parties, and by the terms of his contract he warranted or covenanted that the extension of the "melon spur track" to said pit had been lawfully placed there, and he undertook to defend his grantees in the free and unrestricted use thereof for a period of five years.  It should also be said that Boynton, who entered into the contract with the company for the southern extension of the switch, has since transferred all his right and title to the Northern Gravel Company, a corporation of which he is president.  Before the commencement of this action, the plaintiff gave notice to the railroad company of its claim to the exclusive use of the entire switch from its pit to the main line, for the transportation of sand and gravel, and objected to the use of the Hahn switch for the shipment of such products from the Hoopes pit.

Thereafter, this action was begun in equity to confirm and establish plaintiff's alleged right to exclude all competitors in its line of business from the use of the switch, and to enjoin the railway company from hauling or transporting over said switch the product of any sand or gravel pit other than plaintiff's.

The defendant railway company denies that the contract with plaintiff does or was intended to give the plaintiff any exclusive or superior right in the use of that part of the track known as the Hahn switch.  Hoopes also inter-

venes, alleging that the Hahn switch is and was a part of
the defendant's railway system, and as such is open to the
use of the public, and especially of that portion of the public
owning and using the land in that vicinity.  He also claims
that the terms of the conveyance by his father of the right
of way insured to said grantor, and to the intervener, as his
heir and successor in title, an indefeasible right to ship the
product of his lands (including sand and gravel) over said
switch, and that the railway company was and is without
right or authority to exclude him from such use, or to grant
a monopoly of its use to the plaintiff or to Boynton.

On trial to the court, the testimony developed the facts
substantially as we have stated them.  The court denied the
demand for relief, dismissed the bill, and from this decree
plaintiff appeals.

I.  The admitted or well proved facts in the case clear-
ly demonstrate the correctness of the conclusion reached by
the court below.  That the original Hahn switch was con-
structed for the use and convenience of the
public and the railway company in receiv-
ing, discharging, and transporting freight,
is not open to reasonable doubt.  It is true,
perhaps, that it did not serve a very large
section of the public, but it was sufficiently
large and its needs for shipping facilities for marketing its
products and for the receipt of such freight as it required
were sufficiently great to induce the company to stimulate
and promote the business by providing this accommodation.
That some of the people thus to be benefited asked for the
switch, and that others contributed the right of way or gave
their services in grading the track bed, only strengthens the
inference or presumption of its public character which may
fairly be drawn from the manner of its use after its con-
struction.  The fact that its terminus was upon a public
road, where conveniences for loading and unloading were

1. CARRIERS: fa-
cilities furnish-
ed: discrimina-
tion: allowing
use of spur
track by ship-
per.

afforded; that icehouses and a grain warehouse were located there; that the company there received and carried whatever freight was offered, and there delivered more or less freight shipped by residents of the neighborhood, is shown without substantial dispute. The further fact that, owing to various causes, this general business has been diminished to small proportions, has no tendency to show that the switch has lost its public character, or to vest in the railway company the right to refuse legitimate business offered to it at that point, and grant to a single individual the exclusive use of the track, or to bind itself to operate such track for the benefit of such individual only. Code Supplement, 1913, Section 2125.

For the purposes of this case, it may be admitted that, under appropriate circumstances, a railway common carrier may construct or make use of a private track connecting its line with a factory or other business concern, without giving such connecting link a public character. But nothing of that kind is here presented, unless such private character may be attributed to the extension track from H on the Hahn switch to the plaintiff's pit at D. That track and its use are not here in controversy. But the original track was designed, conceived, constructed, used, and its public character determined, long before the contract on which plaintiff relies was made. Let us suppose that, instead of improving the pit at D, plaintiff had acquired title to one located directly on the Hahn switch,—for example, at H,—and had then secured from the railroad company an agreement to operate that switch for the benefit of plaintiff's business alone, and to exclude from such use all other dealers and shippers. It is quite unthinkable that, in such case, the right or power of the company to grant, or the right of the plaintiff to acquire, such exclusive use of the switch, and divest it of the public character which it had borne for many years, would have the sanction or approval of any court.

If not, then no greater advantage can be secured to it by the expedient of going beyond the terminus of the old switch for the site of its plant, and then extending the track to its door.

II. Whether the contract between plaintiff and the railway company was intended to give the former the exclusive advantage it claims, is a matter of dispute in the testimony of witnesses and arguments of counsel. The trial court held to the theory that such was the intention of the parties, but was of the opinion that the contract was, to that extent, void. As we agree with the view that the company was without power to grant the alleged exclusive rights in the use of the switch, it is unnecessary for us to go further into the construction of the agreement.

III. Counsel for appellant argue very earnestly against the right of Hoopes to intervene in this action. That Hoopes was directly interested in the subject-matter of the controversy between plaintiff and defendant, seems to be very apparent. He was the owner of land, the use and value of which might reasonably be affected by a decision affirming the right of the railway company to grant the exclusive use of the switch to the plaintiff. He had sold a sand or gravel pit on his premises, and agreed to defend his grantees in their right to the use of the switch for the shipment of their product, and he was very materially interested in the decision whether the railway company should be or could be enjoined from handling such freight. True, not having been made a party, such decision might not have bound him as an adjudication; but, if contrary to his contention, it would prove a serious handicap in a subsequent action by or against him. The chief purpose of allowing intervention in any case is to avoid multiplicity of actions, and to give the court a comprehensive view of all the angles of the controversy and of the manner in which its findings

2. PARTIES: intervention: right to intervene.

will affect all the parties in interest.   We are disposed to hold that, as to that portion to which he still holds title, as well as to the other portions which he has agreed to protect in the use of the switch, he was entitled to intervene, and the court did not err in so deciding.

We do not undertake any review of the authorities cited. Their general correctness may be conceded.   None of them justifies any departure from the elementary principles, to say nothing of the provision of our statute which forbids discrimination by a railway carrier, and requires it to afford equal advantages to its patrons in the use of its transportation facilities.   Code Supplement, 1913, Section 2125; 33 Cyc. 637;  *Roby v. State,* 76 Neb. 450 (107 N. W. 766) ; *Bedford, etc., Co. v. Oman,* 115 Ky. 369 (73 S. W. 1038).

The decree below is both equitable and just, and it is— *Affirmed.*

LADD, C. J., EVANS and STEVENS, JJ., concur.